Filed 12/6/13  P. v. Jasso CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS JAVIER JASSO,<br><br>    Defendant and Appellant. | B242229<br><br>(Los Angeles County<br>Super. Ct. No. BA350171)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 18, 2013, be modified as follows:

1.  On page 2, the last line of the third paragraph, the word "appellant" is changed to "Carrillo" so the sentence reads:

Her way of handling the situation was to keep Carrillo away from Art T. and hope Carrillo would give up.

2.  On page 3, the third sentence of the fourth paragraph, in two locations, the word "appellant" is changed to "Carrillo" so the sentence reads:

At some point, Art T. tried to speak to Carrillo man-to-man about the situation, but Carrillo continued to make annoying telephone calls to Art T.'s residence where he lived with his parents.

3. On page 10, the fourth sentence of the second full paragraph, the word "appellant" is changed to "Carrillo" so the sentence reads:

He urged the complaint to the police and even Art T.'s man-to-man visit with Carrillo had not stopped Carrillo's obsessive efforts to continue his relationship with H.A.

4. On page 10, the last sentence of the second full paragraph, the word "appellant's" is changed to the word "the" so the sentence reads:

Fortunately for Art T., Carrillo ran out of ammunition or the gun jammed at a critical point during the shooting, and that spared Art T.'s life.

5. On page 10, the third sentence of the third full paragraph, the words "the defendants" is changed to "appellant and Carrillo" so the sentence reads:

Essentially, in the final phase of the argument, the prosecutor again summarized the evidence against appellant and Carrillo and replied to several points made by trial counsel.

6. On page 10, the fourth sentence of the third full paragraph, in one location, the word "appellant" is changed to "Carrillo" so the sentence reads:

The prosecutor pointed out appellant apparently had arrived and given Carrillo a gun, and his sign to Ryan B. to be quiet indicated appellant was well aware of the entire situation between Carrillo and H.A.

There is no change in the judgment.

Respondent's petition for rehearing is denied. .

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESUS JAVIER JASSO,<br><br>    Defendant and Appellant. | B242229<br><br>(Los Angeles County<br>Super. Ct. No. BA350171) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  Affirmed.

David Arredondo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

Jesus Javier Jasso appeals from the judgment entered after a jury trial in which he was found guilty of attempted willful, deliberate and premeditated murder with a finding a principal was armed with a handgun. (Pen. Code, §§ 664/187, subd. (a), 12022, subd. (a)(1).)[1] At sentencing, the trial court imposed an aggregate term in state prison of one year to life, consisting of a base term of life enhanced by one year for the finding a principal was armed with a firearm.

## BACKGROUND

Appellant argues the sufficiency of the evidence. Hence, we set out the trial evidence in the light most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

In September 2008, H.A. was living with her parents. She had a boyfriend named Art T. In July 2008, she started seeing Art T. after she broke up with her former boyfriend, codefendant Mario Carrillo (Carrillo).[2] Carrillo would not accept the breakup. Carrillo persisted in texting her, calling her and showing up at her residence at all hours of the day and night to see what she was doing. She changed her telephone number, but nothing discouraged him. He continued to harass her. She had not wanted to get the authorities involved. She pretended to be friendly with him, but refused to date him. Her way of handling the situation was to keep Carrillo away from Art T. and hope appellant would give up.

Carrillo was not friendly with Art T., and when Carrillo discovered Art T. was seeing H.A., Carrillo harassed Art T., as well.

According to H.A., appellant was a friend of Carrillo's and the boyfriend of H.A.'s friend, Mercedes. The parties stipulated appellant and Carrillo were friends.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Appellant and codefendant Carrillo were tried jointly, and each defendant was convicted of the December 8, 2008, attempted willful, deliberate and premeditated murder charge in count 1. Carrillo was found guilty of additional charges relating to a September 2008 kidnapping/forcible rape and sexual penetrations charged in counts 2, 3, 4 and 5. In a separate appeal, Carrillo has also appealed from the judgment.

2

At 3:00 a.m., on September 6, 2008, Carrillo kidnapped H.A. in her own car when she returned home from a date with Art T. During the kidnapping, Carrillo pointed his semiautomatic pistol at her to coerce her cooperation. Carrillo had her drive him to his family's apartment, held her there in the one bedroom, forcibly raped her and engaged in forcible sexual penetration. When he permitted her to leave, she drove home. She told her father about the kidnapping. Several hours later, she reported the kidnapping and the forcible sexual misconduct to the police.

On September 8, 2008, in a recorded interview, the police interrogated Carrillo about the kidnapping, rape and sexual penetration. He admitted the offenses but denied the use of a firearm. Carrillo claimed he loved H.A. and simply wanted her to continue to be his girlfriend.

The report to the police did not deter Carrillo. He continued to come by H.A.'s residence where she lived with her family frequently and knocked on her window at 2:00 a.m. At some point, Art T. tried to speak to appellant man-to-man about the situation, but appellant continued to make annoying telephone calls to Art T.'s residence where he lived with his parents. Carrillo threatened to shoot Art T.

At about 6:30 a.m., on December 8, 2008, Carrillo showed up at H.A.'s residence. They argued. Carrillo was upset because H.A. refused to marry him. At about 8:30 a.m., H.A. and Art T. had arranged to meet that morning to jog or to take a walk. At one point, H.A. did not answer her cellular telephone, and Art T. became concerned and drove to her residence.

On the way there, Art T. saw Carrillo two blocks from H.A.'s residence, and Art T. tried again to talk with Carrillo man-to-man. Carrillo said to leave him alone and ran away in the direction of H.A.'s residence. Art T. drove to the residence. He spoke to H.A. outside and then waited for her to get ready. While they were conversing, H.A. saw a silver truck that looked like appellant's drive by at the south end of the block. H.A. testified there were other similar trucks in the neighborhood, but appellant's truck was distinctive as it had black rims. H.A. commented to Art T., "There goes Vision," referring to appellant by his nickname. On two prior occasions, Art T. had seen appellant previously as appellant drove by H.A.'s residence. H.A. had identified appellant as "Vision," Carillo's friend and Mercedes's boyfriend.

As Art T. was waiting outside, the same truck pulled up to the corner north of the residence. Art T. could see appellant sitting in the driver's seat of the truck. Carrillo was in the truck's passenger seat. For two minutes, the men looked in Art T.'s direction and conversed. Then the truck turned and pulled up in front of Art T. Carrillo and appellant made eye contact with Art T. Appellant hunched over, and then Carrillo got out of the car wearing a black glove, walked toward Art T., pulled a handgun from his waistband and pointed the handgun at Art T. Art T. jumped a fence and ran. Art T. turned and saw Carrillo chasing him. Appellant remained in the truck driving slowly after Carrillo as Carrillo chased Art T.

On a residential driveway, Carrillo shot at Art T., and Art T. fell and could not get up. Art T. was wounded during the gunfire. Carrillo stood over him pointing the gun at him, and Art T. closed his eyes. He heard a click. Art T. opened his eyes and saw Carrillo run to the truck. The truck backed up the street, then drove off.

Art T. telephoned H.A. and told her Carrillo had shot him. H.A. telephoned 9-1-1. H.A. found Art T. two doors away bleeding profusely. The police and an ambulance responded. Near Art T., the officers found 9 expended shell casings and two spent bullets.

On December 8, 2008, H.A. identified Carrillo and appellant in two different six-pack photographic identification procedures.

4

Three days later, in the hospital's intensive care unit, in two six-pack photographic displays, Art T. identified Carrillo as the gunman and appellant as the truck's driver. He added that the rims on appellant's truck were black.

Art T. suffered 10 gunshot wounds and almost died. Art T.'s ambition was to be a deputy sheriff, and he now had permanent nerve damage in his legs that prevented him from running, making him ineligible for the police academy. He had had six surgeries and possibly needed more, and at the time of trial, he was still involved with physical therapy. He walked with a cane.

At trial, Art T. identified Carrillo as the gunman and appellant as the driver of the truck. At trial, H.A. identified Carrillo as her former boyfriend and appellant as Carrillo's friend, the owner of the silver truck she saw shortly before the shooting.

Two neighbors witnessed the shooting. Teresa C. heard the shots and saw the gunman apparently pointing a gun and shooting. The gunman then ran and jumped into the rear window of a truck waiting in the middle of the street. The truck drove off. The truck was a newer model, charcoal gray, with a "futuristic look." Ryan B. heard the shots and went outside. He then saw a newer model silver pickup truck, a Toyota Tacoma or Tundra, backing up in the middle of the street. The truck was not "stock" as it was modified with what he recalled as unique aftermarket raised wheels and perhaps distinctive chrome rims. Ryan B. got a partial license plate, 7YR4, from the vehicle.

Ryan B. said he got a good look at the truck's driver, who looked directly at Ryan B. and put his finger to his lips, instructing Ryan B. with that sign to "Be quiet." At trial, and during an extrajudicial six-pack photographic identification procedure, Ryan B. identified appellant as the truck's driver. Ryan B. had never seen appellant before the shooting.

California Department of Motor Vehicle records disclosed the license plate for appellant's Toyota truck was 7Y43053.

After the shooting, neither Art T. nor H.A. heard from, or saw, Carrillo again until the preliminary hearing.

**CONTENTS**

1. *The sufficiency of the evidence*

Appellant contends the identification evidence is insufficient to support the judgment.

a. *Standard of review*

Recently, in *People v. Whisenhunt* (2008) 44 Cal.4th 174, the California Supreme Court summarized the well-established standard of review. " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]' [Citation.]" (*Id*. at p. 200.)

" ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]". . . .' [Citation.]" (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304, 306.)

The uncorroborated testimony of a single witness is sufficient to sustain a conviction unless it is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Indeed, " '[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions. [Citations.]' " (*In re Robert V.* (1982) 132 Cal.App.3d 815, 821.)

b. *The analysis*

Appellant's contention in part misstates the evidence and misapprehends the nature of an appellate court's review for sufficiency of the evidence. Art T. had seen appellant before on two prior occasions. On the day of the shooting, Art T. had an adequate opportunity to observe the driver of the Toyota truck. He positively identified appellant as the truck's driver in the extrajudicial post-shooting six-pack identification procedure and in court as Carrillo's accomplice, the driver of the getaway vehicle.

H.A. had seen appellant's truck drive by minutes before the shooting. The truck was unique in appearance due to its newness and aftermarket modifications.

Two neighbors who did not know appellant or his truck saw the shooting or its immediate aftermath. Teresa C. described appellant's truck. Ryan B. positively identified appellant by his facial appearance and his truck and got a partial license plate number that was highly similar to appellant's actual California license plate number.

The parties stipulated appellant and Carrillo were friends, and H.A. testified appellant was one of Carrillo's friends, making it likely appellant was well aware of Carrillo's obsessive attempts to reclaim H.A. as his girlfriend. Her testimony also made it probative that appellant was the driver assisting Carrillo by supplying the firearm to commit the shooting and in assisting Carrillo during the shooting and the escape.

Multiple witnesses identified appellant as the truck's driver. The identifications were neither physically impossible nor inherently incredible. Discrepancies in the testimony and issues of reliability were for the jury to resolve. (*People v. Elliot* (2012) 53 Cal.4th 535, 585.) Even an identification by one of these witnesses would be sufficient to support a conclusion appellant assisted Carrillo during the shooting. (*People v. Avila* (2009) 46 Cal.4th 680, 703-704 [identification testimony of a single

7

witness is sufficient to support the judgment]; *People v. Williams* (1997) 16 Cal.4th 153, 248 [the court uses the general test for sufficiency of the evidence to determine the sufficiency of an out-of-court identification in supporting a judgment].)  The identification evidence amply supports the judgment.

2.  *Prosecutorial misconduct*

Appellant contends the prosecutor committed misconduct during the final comments he made to the jury.  The complained-of comments are  italicized below.

a.  *Background*

The prosecutor initiated his final comments to the jury by saying the very reason they were all there was because Carrillo could not accept H.A.'s "No."  Carrillo's inability to accept reality had landed them all here in court three years later.  He urged the jury it did not have to rely on H.A.'s claim of what had occurred alone concerning the September 2008 kidnapping and forcible rape and sexual penetration.  Appellant had admitted these crimes during the subsequent videotaped police interview, although he did not admit he had committed the offenses with a firearm.

The prosecutor said, as it was, H.A. had to relive this September 2008 incident and appear in court as a witness for the trial as "no means no."  He urged, "*So she's been through a lot since 2008 and now its time for no to mean no.  And you're the ones that can make that happen.  You need to tell both of the defendants that no meant no and find them guilty as charged.*"  (Italics added.)

At this point, appellant's trial counsel objected the evidence concerning the September 2008 kidnapping, rape and sexual penetrations did not relate to appellant.

The trial court admonished the jury:  "Okay.  Remember, ladies and gentlemen, as I have mentioned to you before, you must decide each defendant['s guilt] separately and consider the evidence independently as to each defendant."

The prosecutor explained to the jury his theme applied to both defendants:  "*And I would beg to differ with counsel because when I say no means no, no was Hermila [A.] telling [Carrillo to] stop coming over to harass[] us.  And the defendant—that defendant*

8

*[appellant] got involved as he did that he became part of that. And no should mean no to him just as well.*" (Italics added.)

Appellant's trial counsel objected again on the same grounds.

The trial court admonished the jury: "Okay. Understanding that, again, decide the evidence independently as to each defendant and each defendant must be determined guilty or not guilty based upon the evidence independently of the other."

The prosecutor continued arguing: "*Let's talk about [appellant] then. Let's make it clear we're talking about [appellant] here. And let's see if the no means no applies to him.*"

The prosecutor then described the evidence indicating appellant knowingly acted as an aider and abettor and the getaway driver during the December 2008 shooting. The prosecutor urged appellant's conduct indicated appellant was well aware of the situation that existed among Carrillo, H.A. and Art T. When Carrillo and appellant arrived in front of H.A.'s residence, the two of them were "smirking." Earlier Carrillo had run away from Art T. But now Carrillo was not running. Carrillo now had a handgun and was acting with bravado. Appellant's conduct during the shooting showed he was well aware of what was going on. Appellant followed Carrillo slowly in his truck and drove Carrillo off after the shooting. And in driving off, appellant directed Ryan B. by a sign to keep quiet about what Ryan B. had seen regarding the shooting. The prosecutor argued that evidence indicated appellant was fully involved in the shooting and had acted with knowledge of Carrillo's purpose.

He argued the crimes were "*intertwined.*" Appellant's trial counsel objected the comment implied appellant was charged in both incidents. The trial court instructed the prosecutor to clarify his argument.

The prosecutor said, "These crimes are intertwined as . . . they are the result of that relationship that [Carrillo] had with Hermila [A.] where he wouldn't take no for an answer." The prosecutor said he had discussed appellant's involvement in the shooting and now would delineate the evidence supporting Carrillo's guilt. He emphasized his argument from this point on related only to Carrillo. He urged the complaint to the police

9

and even Art T.'s man-to-man visit with appellant had not stopped Carrillo's obsessive efforts to continue his relationship with H.A. After H.A. reported the kidnapping and rape to the police, events escalated. Carrillo's next move was to 'take out" the boyfriend. Fortunately for Art T., Carrillo ran out of ammunition or appellant's gun jammed at a critical point during the shooting, and that spared Art T.'s life.

Trial counsel then made their closing comments to the jury. The prosecutor closed thereafter, twice arguing with respect to Carillo, "no means no." Essentially, in the final phase of the argument, the prosecutor again summarized the evidence against the defendants and replied to several points made by trial counsel. The prosecutor pointed out appellant apparently had arrived and given appellant a gun, and his sign to Ryan B. to be quiet indicated appellant was well aware of the entire situation between Carrillo and H.A. The prosecutor urged appellant was as involved in the shooting as Carrillo was.

b. *The relevant legal principles*

Prosecutors are given " ' " 'wide latitude' " ' " in trying their cases. (*People v. Hill* (1998) 17 Cal.4th 800, 819 [wide latitude given in closing argument].) " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citations.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 441.) A prosecutor may not misstate or mischaracterize the evidence. (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1268.)

"The applicable federal and state standards regarding prosecutorial misconduct are well established." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).) Under federal constitutional standards, a prosecutor's " ' "intemperate behavior" ' " constitutes misconduct if it is so " ' " 'egregious' " ' " as to render the trial "fundamentally unfair" under due process principles. (*Ibid.*) Under state law, a prosecutor commits misconduct by engaging in deceptive or reprehensible methods of persuasion. (*Ibid.*) Where a prosecutor has engaged in misconduct, the reviewing court considers the record as a whole to determine if the alleged harm resulted in a miscarriage of justice. (*People v. Duncan* (1991) 53 Cal.3d 955, 976-977.) In considering prejudice "when the claim

10

focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*Samayoa*, *supra*, 15 Cal.4th at p. 841.)

c. *The analysis*

Appellant contends there was prosecutorial misconduct during the final comments to the jury as the "no means no" argument appealed to the jury's passion and prejudice. He argues there was no proof appellant was involved in the earlier kidnapping and rape of H.A. Therefore, the prosecutor's argument was likely to have persuaded the jury that appellant had something to do with Carrillo's September 2008 misconduct, when appellant had nothing to do with these earlier crimes. He claims the September 2008 crimes were so offensive that the effect of including appellant in the "no means no" argument had a spill-over effect that improperly influenced appellant's conviction as an aider and abettor to the attempted murder. He urges the trial court's admonitions the evidence against each defendant should be considered and weighed independently would not have had the effect of curing the possible harm flowing from the prosecutor's remarks.

The contention lacks merit. When the prosecutor made his "no means no" argument and urged the charges were intertwined, the comments did not constituted a reprehensible attempt to persuade the jury that appellant was involved in the September 2008 kidnapping and rape. It was apparent from the charges and the evidence, as well as counsels' final comments to the jury, that no juror reasonably would believe appellant was involved in the September 2008 incident of kidnapping and rape. Moreover, the trial court instructed the jury that evidence was introduced against Carrillo respecting the September 2008 kidnapping and rape, and such evidence was not admitted against appellant. The trial court specifically charged the jury, "Do not consider this evidence against the other defendant," meaning appellant. During closing comments, when trial counsel objected on grounds of prosecutorial misconduct, the trial court twice admonished the jury to consider the defendants' guilt separately. On this record there is

11

no reasonable likelihood the jury would have been misled into believing appellant was involved in the earlier kidnapping and rape. We presume the jury fully understood and applied the court's instructions. (*People v. Tully* (2012) 54 Cal.4th 952, 1021.)

Trial counsel attached a post-trial affidavit to the motion for new trial. Therein, a juror claimed the initial vote of guilt regarding appellant was 6 to 6. She said she and other jurors were confused by the "no means no" argument and misunderstood and believed appellant was involved in the earlier incident and those beliefs influenced the jurors' consideration of appellant's guilt of the later shooting.

Evidence Code section 1150 precludes the use of such post-trial juror affidavits concerning the mental processes of the jury to impeach its verdict. The trial court properly refused to consider the juror's statements in the affidavit. And pursuant to Evidence Code section 1150, this court also cannot consider the juror's comments in determining whether the prosecutor's final comments led to jury confusion.

Furthermore, we note the trial court denied the motion for new trial insofar as it made the same claim of prosecutorial misconduct. As the trial court commented, Evidence Code section 1150 put the death knell to appellant's claim of jury confusion arising of prosecutorial misconduct. The trial court said in the circumstances, trial counsel was making too much of the influence the prosecutor's comments might have had on the jury. The jury had been "well educated on the necessity of deciding the case based on the evidence . . . ." It was instructed the statements of counsel were not evidence, and no evidence had been introduced at trial suggesting appellant was involved in Carrillo's September 2008 crimes. The trial court had notes or recalled that it was explicit with the jurors at the beginning of the trial concerning appellant's lack of involvement in the earlier incident.[3]

---

[3] On appeal, appellant does not contend his motion for new trial or pretrial severance motion were improperly denied. However, he appears to conflate such claims with the two contentions he does raise. This court examined the record with respect to whether the pretrial severance motion and the motion for new trial were properly denied. We find no error in the trial court's rulings.

12

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:



CROSKEY, J.



ALDRICH, J.


13